**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MARTIN S. PARNESS, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 15-3505 (JLL) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CHRISTOPHER J. CHRISTIE, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**LINARES**, District Judge:

Plaintiff, Martin Parness, filed a complaint against Defendants in the Southern District of New York on April 23, 2015. (ECF No. 1). The Southern District transferred this matter to the District of New Jersey on May 20, 2015. (ECF No. 5, 6). On July 27, 2015, this Court granted Plaintiff's application to proceed *in forma pauperis*. (ECF No. 10). At this time, the Court must review the Complaint, pursuant to 28 U.S.C. § 1915(e)(2)(B) to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief. For the reasons set out below, this Court will dismiss Plaintiff's complaint in its entirety for want of subject matter jurisdiction and failure to state a claim for which relief may be granted.

## I.  BACKGROUND

The following allegations are drawn from Plaintiff's complaint.[1]  Plaintiff, William Parness, is an individual currently incarcerated in the Essex County Correctional Facility.  (ECF No. 1 at 13).[2]  His incarceration arises out of his "failure to pay a matrimonial judgment in favor of his former wife . . . Robin Parness-Lipson, as well as his alleged failure to take steps that would allow [Lipson] to collect the judgment in Israel, where [Plaintiff] and his current wife own real estate." *Parness-Lipson v. Parness*, 2014 WL 2533783, at *1 (N.J. App. Div. June 6, 2014).  Plaintiff alleges that this judgment was fraudulently obtained by his former wife through proceedings in the New Jersey Superior Court, Essex County, Chancery Division, Family Part, in

---

[1] The allegations presented in this section of this Court's opinion provide a relatively brief summary of the numerous claims, accusations, and assertions contained in Plaintiff's complaint. Plaintiff's complaint is approximately two hundred pages in length, and his caption alone is nine pages long.  Not including several thousand John Doe Defendants, Plaintiff names approximately 100 Defendants including the current Governor of New Jersey, several Superior Court judges in both the New Jersey Chancery and Appellate Divisions, the Chief Justice of the New Jersey Supreme Court, several state attorneys general, the former federal attorney general, the United States Attorney for the District of New Jersey, judicial law clerks, New Jersey state court administrators and staff, several law firms, the facility in which he is incarcerated, the supervisory officials at that facility, the lawyers involved in his Family Part cases, the State of New Jersey, and the United States of America.  (ECF No. 1 at 1-9).  For each named Defendant, Plaintiff has also named a fictitious spouse who he also alleges joined the conspiracy to aid their marital property.  (*Id.* at 1-67).  Many of the named Defendants are only tangentially related to Petitioner's claims and assertions, and some, including many of the John Does and fictitious spouses, are not mentioned again after being named in the complaint. Plaintiff's complaint is replete with many unsupported assertions, conclusory allegations which do not follow from the pled facts, and accusations which are, at best, of dubious plausibility. This Court therefore repeats here only the central and most important allegations which are necessary to provide a basic understanding of Plaintiff's claims sufficient to support this Court's disposition of Plaintiff's complaint.  Finally, this Court notes that while Plaintiff's complaint is filled with references to other documents and citations to an appendix Plaintiff may have intended to file with his complaint, no such appendix or documents have been filed.

[2] All page numbers attributed to ECF No. 1 represent the Clerk's PageID numbers.

April of 2003.  (ECF No. 1 at 13).  Plaintiff alleges that his former wife, her family, and her attorneys begat a complicated series of conspiracies against him ultimately culminating in the loss of certain property in the 1990s and his eventual incarceration.  (*Id.* at 68-69).

　　　Plaintiff alleges three separate conspiracies, all of which he claims violated the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962, specifically 18 U.S.C. § 1962(c)-(d).  (*Id.*).  The first such conspiracy allegedly arose out of certain frauds upon the Bankruptcy and New Jersey Family Part courts committed by his former wife and a corporation to which she was attached in 1995 and 2003.  (*Id.* at 68).  The second alleged conspiracy apparently came into being when his former wife and her family bribed several attorneys, including Plaintiff's attorneys, and two New Jersey Superior Court judges who heard Plaintiff's case between 2003 and 2012, Judges Troiano and Casale, ultimately resulting in the contempt order under which Plaintiff remains incarcerated.  (*Id.* at 68-69).  This second conspiracy also includes judges and employees of both the Essex County Family Part Court and the New Jersey Appellate Division who upheld Plaintiff's incarceration through 2013.  The third and final conspiracy Plaintiff asserts concerns the alleged bribery of New Jersey Governor Chris Christie by Plaintiff's ex-wife.  (*Id.* at 167-77).  Plaintiff asserts that Christie, to avoid being exposed for these alleged straw-donor bribes, effectively conspired with several attorneys general, several United States attorneys, and the ranking official in the New Jersey Court system, including the Chief Justice of the New Jersey Supreme Court, to close any and all judicial avenues of relief to Plaintiff following Plaintiff's loss in the trial courts in 2012.  (*Id.*).  Because Plaintiff's allegations are not clear and are, in many places, based upon his own bald assertions without any supporting allegations or facts, it is unclear how distinct the second and third conspiracies truly are from one another.

3

The first alleged conspiracy arises out of Plaintiff's divorce in July, 1992. (*Id.* at 72). At the time of Plaintiff's divorce from his former wife, Robin Lipson ("Lipson"), Plaintiff agreed to pay Lipson $2,000 per month in child support until the emancipation of the couple's two children, $1,500 per month in alimony for four years, and an equitable distribution of $40,000. (*Id.*). Plaintiff also agreed to take on $28,000 in debt arising out of the marriage and Lipson's counsel fees in the divorce. (*Id.*). At that time, Plaintiff also owned several properties, most of which were subject to "under water" mortgages. Plaintiff retained possession of these properties in the initial divorce. (*Id.*). Among those properties was 1000 Washington Street Corporation and the associated building in Hoboken, New Jersey. (*Id.*).

Due to an apparent tenant problem, this corporation defaulted on its mortgage and ultimately underwent Chapter 11 bankruptcy. (*Id.* at 72-73). Because of the bankruptcy, Plaintiff became unable to pay the money owed Lipson in the divorce. *Id.* Plaintiff and Lipson therefore agreed to increase the amount of money owed by Plaintiff to Lipson to $181,000, allegedly not subject to any interest, in recompense for his missing certain payments. (*Id.* at 73-74). This agreement was ultimately memorialized in an October 1994 consent order, which was amended in some fashion in January 1995. (*Id.* at 74).

As Plaintiff continued to be unable to pay the money owed Lipson, Lipson apparently filed a complaint with the Bankruptcy Court handling 1000 Washington Street's bankruptcy seeking ownership of Plaintiff's stock in the corporation in lieu of the money owed her. (*Id.* at 76-77). Plaintiff alleges that these filings represented a fraud on the court in so much as Lipson stated that she had "no more money and . . . no family" to help her take care of her children were she not awarded Plaintiff's shares. (*Id.* at 76-78). Plaintiff alleges that Lipson not only has a well to do

4

brother who could help her, but used several thousand dollars in child support to buy a house in Westfield, New Jersey. (*Id.*). Plaintiff alleges that Lipson used this fraud on the court to obtain control of 1000 Washington street, and used this control to conspire with 1000 Washington Street and an unknown corporation owned by Lipson to embezzle rents from 1000 Washington Street over the next several years. (*Id.* at 78-88). This "conspiracy" between Lipson and the unknown corporation forms the basis for Plaintiff's first alleged conspiracy. Plaintiff also alleges that Lipson's filing of a complaint seeking a judgment against Plaintiff in the amount of $341,500 in the Essex County Family Part in 2003 represents a further fraud on the court and predicate act in support of his first alleged RICO conspiracy. (*Id.* at 89-90). While this first conspiracy was ongoing, Plaintiff emigrated to Israel in 1995 and ultimately became an Israeli citizen and remarried. (*Id.* at 85).

In April 2003, Lipson filed an action in the Superior Court of New Jersey, Essex County, Chancery Division – Family Part seeking $341,500 which she asserted Plaintiff owed her in alimony, child support, and outstanding debt from her divorce with Plaintiff. (*Id.* at 91). Lipson also sought an arrest warrant for Plaintiff as he was apparently in contempt of the earlier divorce judgments. (*Id.*). This matter came before Superior Court Judge James Troiano. (*Id.*). Although Plaintiff alleges that he was never properly served in this action and Lipson only obtained this judgment, including the arrest warrant, through a fraud perpetrated on the Superior Court, Judge Troiano ultimately granted Lipson's request and entered a judgment in her favor for $341,500 and issued an arrest warrant in Plaintiff's name for civil contempt. (*Id.* at 91-93). Because Parness resided in Israel at that point, and despite efforts by Lipson to have him arrested sooner, the judgment and order were not enforced against Plaintiff until 2009. (*Id.* at 91-95).

5

On April 17, 2009, while vacationing in New Jersey with his new wife, Plaintiff was stopped by the Ridgefield police for a minor traffic violation. (*Id.* at 94). While stopped, the police discovered the outstanding warrant for Plaintiff's arrest arising out of the 2003 judgment. (*Id.*). Plaintiff was therefore arrested and incarcerated at the Essex County Correctional Facility. (*Id.* at 94-95). Following his arrest, Plaintiff was apparently arraigned before Judge Troiano on or about April 21, 2009, and litigation of the 2003 judgment and Plaintiff's civil contempt warrant began before Troiano. (*Id.* at 95). Plaintiff's second alleged RICO conspiracy arises out of this litigation. Plaintiff alleges that this second conspiracy first arose between the two lawyers who represented him in front of Troiano, James Friedman and Jonathan Rubenstein, who allegedly conspired with Lipson and her lawyer in the 2009 litigation to sabotage Plaintiff's case and gouge him through the charging of excessive legal fees. (*Id.* at 95-99). Plaintiff alleges that, through Friedman who was apparently a friend of Judge Troiano, Lipson and the lawyers conspired and ultimately bribed Troiano to hamper Plaintiff's case and keep him incarcerated. (*Id.*). Plaintiff thus alleges that Troiano accepted a $5,000 bribe which was given to Troiano by either "Friedman or [Lipson's counsel] soon after the April 21, 2009 hearing." (*Id.* at 99). This bribe also was apparently to include a portion of any moneys recovered from Plaintiff.[3] (*Id.*).

Plaintiff alleges that Lipson, the lawyers, and Judge Troiano thereafter impeded his case

---

[3] Plaintiff, in support of his allegation that a bribe was made to Troiano, alleges that Judge Troiano ultimately resigned from the bench because of Plaintiff's bribery claims. (ECF No. 1 at 159-60). This assertion, however, is directly contradicted by readily available public records. This Court takes judicial notice that Judge Troiano actually retired, but is currently serving on the Essex County bench pursuant to a recall order. *See* Recall Order, available at http://www.judiciary.state.nj.us/notices/2014/n140925b.pdf.

and engaged in "perjury, attempted extortion, kidnapping, extortion, perjury, and other criminal acts" without further elaboration as to these specific alleged predicate acts. (*Id.* at 101-02). Plaintiff does, however, allege that Lipson engaged in further frauds on the court by selectively filing documents in the 2009 action and allegedly admitting to lying and defrauding the Bankruptcy court. (*Id.* at 102-03). Plaintiff further claims that his lawyer refused to properly support his claims in court and told him that there was "nothing there" to support his allegations that Lipson embezzled funds in the 1990s. (*Id.* at 104-05). Plaintiff also alleges that counsel refused to fight the Troiano Court's conclusion that because Plaintiff was properly served in Family Court proceedings in 1995, that service carried over to the 2003 hearing, and that Plaintiff was thus properly served in regards to that hearing. (*Id.* at 104).

Plaintiff thereafter recounts numerous encounters between himself and his lawyers in the 2009 matter in which he disagreed with their decisions regarding his case. (*Id.* at 105-132). Plaintiff alleges that many of these actions, including refusing to submit Plaintiff's proposed documents to the court, interactions with potential witnesses, and counsel's decisions as to what evidence to present to Judge Troiano amounted to either fraud or some other unclearly defined form of racketeering behavior. (*Id.*). Plaintiff further alleges that his hearings before Judge Troiano in May 2010 were essentially sham proceedings designed to create a record which would appear to be thorough to the Appellate Division without actually addressing Plaintiff's concerns. (*Id.* at 123-25). Plaintiff also claims that his rights were violated during the family part hearing because he was shackled and restrained while present before Troiano. (*Id.* at 124). Petitioner alleges that counsel's failings in these hearings ultimately resulted in a "fraudulent judgment of over $600,000" and Petitioner's "illegal" incarceration for some six years.

7

After the entry of judgment, Plaintiff appealed Judge Troiano's order.[4]   (*Id.* at 145-46). Plaintiff alleges that, when the appeal was filed "Judge Troiano enlisted the assistance of Judge Fuentes of the Appellate Division, a close colleague of Judge Troiano, to request from Ariel Rodriguez, [then] Acting Administrative Judge of the Appellate Division, [that Fuentes] be assigned" Plaintiff's appeal.   (*Id.* at 146).   Plaintiff alleges that Judges Fuentes and Rodriguez thereafter enlisted Judge Harris to aid them in disposing of his appeal, which the judges accomplished by denying his motions (including motions to proceed as an indigent and for transcripts at the public expense) before the Appellate Division.   (*Id.* at 151-53).   Plaintiff contends that each of these motion denials was an example of mail or wire fraud.   (*Id.* at 152-53). His motions having been denied, Plaintiff's appeal was ultimately dismissed.   (*Id.*).   This dismissal also apparently involved the Clerk of the Appellate Division, Joseph Orlando, who Plaintiff alleges was brought into the conspiracy by the Appellate Division judges.   (*Id.* at 153-54).

Plaintiff then apparently filed a petition for certification to the New Jersey Supreme Court. (*Id.* at 154).   Plaintiff alleges that on December 6, 2012, the Supreme Court remanded the matter to the Chancery Division, Family Part solely for a hearing "in accordance with *Marshall v. Matthei*, [744 A.2d 209 (N.J. App. Div. 2000) (requiring periodic evidentiary hearings to determine if the "circumstances of a person incarcerated under a civil contempt order have changed sufficiently to warrant his release)."   (*Id.* at 157-58).   Prior to this remand, however, Plaintiff alleges that several

---

[4] Plaintiff also attempted to belatedly appeal the entry of a restraining order preventing Plaintiff from contacting the Hort Defendants because of a letter he had sent them which Judge Troiano deemed threatening.   (*Id.* at 130-146).

8

New Jersey Supreme Court employees spontaneously joined the conspiracy against Plaintiff by "sabotaging" his appeal by delaying the consideration of some of his motions before the Supreme Court. (*Id.* at 158-59). The New Jersey Supreme Court ultimately denied the petition for certification as to Plaintiff's appeal on March 28, 2013. *See Parness-Lipson*, 2014 WL 2533783 at *1.

After the remand order, Plaintiff "prepared" and filed "pleadings" which the Superior Court construed as a motion and forwarded to Judge Kessler's chambers. (ECF No. 1 at 159-61). Because of defects associated with Plaintiff's lack of and eventual attempt at payment of the filing fee for a motion in the Superior Court, Plaintiff's "pleadings" were returned to him several times with instructions on how to properly file them, by both members of the Superior Court's clerk's office and members of Judge Kessler's chambers. (*Id.*). Plaintiff alleges that, by returning his check, the court clerks, Judge Kessler, and Kessler's law clerk delayed his *Matthei* hearing and in doing so joined the alleged RICO conspiracies. (*Id.*). Plaintiff finally complied with the requirements for the filing in May 2013, at which point his case was assigned to Superior Court Judge Michael Casale as Judge Troiano had retired. (*Id.* at 163). Plaintiff alleges that Casale came to a meeting of the minds with Troiano and thus joined the conspiracy. (*Id.* at 163-64). Plaintiff also alleges that Casale was bribed by Lipson. (*Id.* at 164). Plaintiff then asserts that, as part of the conspiracy, Casale denied him a fair evidentiary hearing on the *Matthei* remand.[5]

---

[5] The Appellate Division described that hearing as follows in its opinion on Plaintiff's appeal therefrom: the hearings "largely consisted of verbal sparring between the assigned judge and [Plaintiff], with [Plaintiff] insisting that the prior judgment was the product of a conspiracy between his attorney, the court, and virtually anyone else associated with the case, and the judge trying to impress on defendant that his arguments were beside the point [as the judgment was final]." *Parness-Lipson*, 2014 WL 2533783 at 2.

(*Id.* at 164-65).   On appeal from that hearing, the Appellate Division remanded the matter for another *Matthei* hearing at which Plaintiff would be entitled to appointed counsel.   *Parness-Lipson*, 2014 WL 2533783 at -3.   Although Plaintiff apparently originally intended to appeal that decision by the Appellate Division, he ultimately decided against it and a decision on this new remand is still pending as of the filing of Plaintiff's complaint.   (ECF No. 1 at 177-78).

The Third and final RICO conspiracy Plaintiff alleges arises out of his claims that certain public officials, including Governor Chris Christie and Chief Justice Stuart Rabner of the New Jersey Supreme Court, have acted to constrain Plaintiff's ability to contest his continued imprisonment.   Plaintiff alleges that he believes that, during a fundraiser, the Lipsons and their friends the Holts made donations to Christie in exchange for Christie pressuring the New Jersey Court system to continue Plaintiff's incarceration.   (*Id.* at 168-69).   Plaintiff's asserts that Christie effectively maintains nearly absolute authority over the New Jersey legal system through his appointment and oversight of several New Jersey attorneys general, several New Jersey judges, the Public Defender, and the New Jersey Office of Attorney Ethics. (*Id.*).   Plaintiff also asserts that Christie used his contacts to create a conspiracy in which his "friends" in the FBI, the United States Attorney's Office for the District of New Jersey, the federal Attorney General's Office, the New Jersey Supreme Court, and the Essex County Correctional Facility to prevent Plaintiff from making claims and curtail any investigation into Plaintiff's claims.   (*Id.* at 168-77).

10

## II.  DISCUSSION

### A.  Legal Standard

Per the Prison Litigation Reform Act, Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (April 26, 1996) ("PLRA"), district courts must review complaints in those civil actions in which the plaintiff is proceeding *in forma pauperis*, *see* 28 U.S.C. § 1915(e)(2)(B). The PLRA directs district courts to *sua sponte* dismiss any claim that is frivolous, is malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.   This action is subject to *sua sponte* screening for dismissal under 28 U.S.C. §§ 1915(e)(2)(B) as Plaintiff is proceeding *in forma pauperis*.

According to the Supreme Court's decision in *Ashcroft v. Iqbal*, "a pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"   556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   To survive *sua sponte* screening for failure to state a claim,[6] the complaint must allege "sufficient factual matter" to show that the claim is facially plausible.   *Fowler v. UPMS Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 n. 3 (3d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).   Moreover, while *pro se*

---

[6]      "The legal standard for dismissing a complaint for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) is the same as that for dismissing a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6)."   *Schreane v. Seana*, 506 F. App'x 120, 122 (3d Cir. 2012) (citing *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)); *Mitchell v. Beard*, 492 F. App'x 230, 232 (3d Cir. 2012) (discussing 28 U.S.C. § 1997e(c)(1)); *Courteau v. United States*, 287 F. App'x 159, 162 (3d Cir. 2008) (discussing 28 U.S.C. § 1915A(b)).

pleadings are liberally construed, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted) (emphasis added).

## B.  Plaintiff's RICO Claims

Plaintiff first asserts civil claims against Defendants for violations of the Racketeer Influenced and Corrupt Organization ("RICO") Act.   18 U.S.C. § 1962(c) "makes it unlawful 'for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'"   *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (quoting 18 U.S.C. § 1962(c)). Section 1962(d) expands liability under the statute by making it "unlawful for any person to conspire to violate [18 U.S.C. § 1962(c)]".   18 U.S.C. § 1962(d).   "The RICO statute provides for civil damages for any person injured in his business or property by reason of a violation of [§ 1962]."   *Amos v. Franklin Fin. Servs. Corp.*, 509 F. App'x 165, 167 (2013) (quoting *Tabas v. Tabas*, 47 F.3d 1280, 1289 (3d Cir. 1995)).

A violation of the statute

> requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.   The plaintiff must, of course, allege each of these elements to state a claim.   Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of § 1962, nor is the mere commission of the predicate offenses.   In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.

*Id.*   The injury to business or property element requires "proof of a concrete financial loss and not mere injury to a valuable intangible property interest." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (quoting *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994)).   A complaint therefore must contain allegations "of actual monetary loss, i.e., an out-of-pocket loss" to adequately plead the injury element.   *Id.*   Physical or emotional harm to a person is insufficient to show that a person was injured in his business or property under the act.   *Magnum v. Archdiocese of Philadelphia*, 253 F. App'x 224, 227 (3d Cir. 2007).   "Similarly, losses which flow from personal injuries are not [damage to] property under RICO."   *Id.* (internal quotations omitted).   Losses derived from a Plaintiff's false imprisonment are derivative of a personal injury, and therefore cannot constitute a RICO injury.   *See Magnum v. Archdiocese of Philadelphia*, No. 06-2589, 2006 WL 3359642, at *4 (E.D. Pa. Nov. 17, 2006), *aff'd*, 236 F. App'x 224 (2007); *see also Evans v. City of Chicago*, 434 F.3d 916, 926-27 (7th Cir. 2006), *overruled in part on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).

As to the injury suffered, a civil RICO plaintiff is also required to plead causation.   "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well."   *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010).   "Proximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations; proximate cause thus requires 'some direct relation between the injury asserted and the injurious conduct alleged.'"   *Id.* (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).   Where the link between the RICO acts and the alleged injury is too remote, purely contingent, or indirect, that link is insufficient to establish proximate cause.

13

A plaintiff establishes a pattern of racketeering activity "by showing that the defendants engaged in at least two predicate acts within ten years of each other." *Amos*, 509 F. App'x at 168. Included among potential predicate acts are "federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343." *Id.* "[M]ail or wire fraud consists of: '(1) a scheme to defraud; (2) use of the mails [or wires] to further that scheme; and (3) fraudulent intent.'" *Id.* (quoting *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002)). Predicate acts under the statute also include "any act or threat involving . . . kidnapping,  . . . bribery[ or] extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year" as well as the bribery of public officials under 18 U.S.C. § 201. *See* 18 U.S.C. § 1961(1). In order to be liable under the statute, each defendant must have participated in "two or more predicate offenses sufficient to constitute a pattern." *Amos*, 509 F. App'x at 168 (quoting *Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir. 1990)).

Where the alleged predicate acts asserted include fraud claims, such as mail or wire fraud, a plaintiff must meet the heightened pleading requirements of Rule 9(b) in order to state a claim for relief. *CareOne, LLC v. Burris*, Civil Action No. 10-2309, 2011 WL 2623503, at *8 (D.N.J. June 28, 2011); *see also Waden v. Mcelland*, 288 F.3d 105, 114 (3d Cir. 2002). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In order to satisfy this pleading requirement, a plaintiff must "identify[] the purpose of the [mailing or use of wires] within the defendant's fraudulent scheme and specify[] the fraudulent statement, the time, place, and speaker and content of the alleged misrepresentation." *Burris*, 2011 WL 2623503 at *8 (quoting *Annulli v. Panikkar*, 200 F.3d 189, 200 n. 10 (3d Cir. 1999), *overruled on other grounds by Rotella v. Wood*, 528 U.S. 549 (2000)). A plaintiff asserting

14

a fraud claim must therefore allege the "who, what, when, and where details of the alleged fraud" in order to meet the requirements of the rule. *District 1199P Health and Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 527 (D.N.J. 2011). "'The purpose of Rule 9(b) is to provide notice of the precise misconduct with which defendants are charged' in order to give them an opportunity to respond meaningfully to the complaint, 'and to prevent false or unsubstantiated charges.'" *Id.* (quoting *Rolo v. City of Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998)). A plaintiff therefore "must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004), *abrogated in part on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

RICO claims are subject to a four year statute of limitations. *See, e.g., Mathews v. Kidder, Peabody, & Co.*, 260 F.3d 239, 244-45 (3d Cir. 2001). A plaintiff's RICO claim "accrues when 'plaintiffs knew or should have known of their injury." *Id.* at 250 (quoting *Forbes v. Eagleson*, 228 F.3d 471, 484 (3d Cir. 2000)). The accrual inquiry "is both subjective and objective. The subjective component needs little explanation – a claim accrues no later than when the plaintiffs themselves discover their injuries." *Id.* at 250. Under the objective facet of the inquiry, accrual of the claim occurs when plaintiffs should have known of their injury and the source of the injury. *Prudential Ins. Co. of Am. V. U.S. Gypsum Co.*, 359 F.3d 226, 233 (3d Cir. 2004).

Plaintiff pleads three separate alleged RICO conspiracies. The first such conspiracy Plaintiff pleads concerns the actions of his ex-wife in enforcing and amending their judgment of divorce and alleged frauds upon the Bankruptcy Court in 1995 and the New Jersey Superior Court

in 2003.   As pled, however, it is clear that Plaintiff certainly knew of the injury he allegedly

suffered as a result of this purported conspiracy – the loss of his former building in Hoboken, as

well as his ex-wife's involvement in that loss by the time he was arrested in 2009.   As Plaintiff

was aware of both the alleged loss and the perpetrator of that loss in 2009, and did not bring the

current suit until April of 2015, more than four years passed between the latest possible accrual of

Plaintiff's claim as to the first conspiracy in 2009 and the filing of the complaint, and Plaintiff's

first RICO claim is thus barred by the four year statute of limitations.   *Mathews*, 260 F.3d at 244-

45, 250-51.   This Court will therefore dismiss Plaintiff's first RICO claim as time barred.

Plaintiff's remaining RICO conspiracy allegations arise out of his arrest for contempt of

court and continued imprisonment thereafter.   Plaintiff alleges that his wife, counsel, the judges

hearing his case in the Superior Court, the Appellate Division judges who heard his appeal, and

numerous state officials all conspired, through an alleged RICO enterprise, to keep Plaintiff

"illegally" incarcerated on the contempt charges.   While Plaintiff's allegations as to these two

alleged RICO conspiracies present numerous potential pleading issues,[7] these RICO claims suffer

from one clear defect which prevents them from stating a claim that this Court has jurisdiction to

---

[7] To the extent that certain alleged RICO defendants, such as the Appellate Division judges, are
added as Defendants pursuant to claims of fraud, Plaintiff has not pled the "who, what, when,
and where details of the alleged fraud" with sufficient specificity to meet the requirements of
Rule 9(b) as he has not clearly identified what portions of the rulings, letters, and other
documents he suggests were fraudulent or otherwise fraudulent.   *See District 1199P
Health and Welfare Plan*, 784 F. Supp. 2d at 527. Likewise, many of Plaintiff's allegations of
"kidnapping," bribery, or violations of the Travel Act are no more than base allegations without
supporting facts which are insufficient to adequately allege predicate RICO acts.   *See Iqbal*, 556
U.S. at 678.   This Court likewise warns Plaintiff that if it becomes apparent that he is aware that
his allegations, which appear unlikely, if not implausible, are without any evidentiary support or
are not likely to receive evidentiary support through a reasonable period of discovery, he may be
subject to sanction pursuant to Federal Rule of Civil Procedure 11.

hear.   The only injury Plaintiff pleads he has suffered as a result of these RICO conspiracies are

his incarceration on a civil contempt order and the Superior Court's judgment in favor of his ex-

wife for $600,000.   The other injuries Plaintiff pleads, such as the loss of his property and business

in Israel, are the result of his allegedly illegal incarceration.

      The problem with Plaintiff's second and third RICO claims is that these claims for damages

could only succeed if this Court were to find that the state court's judgments were the product of

fraud, the denial of Plaintiff's due process rights, or both.   Because a judgment in this Court in

favor of Plaintiff in these claims would impugn the state court's previous judgments, Plaintiff's

second and third RICO claims and his § 1983 claims are subject to dismissal under the *Rooker-*

*Feldman* doctrine.   As the Third Circuit has explained,

> "Under the *Rooker-Feldman* doctrine, a district court is precluded
> from entertaining an action, that is, the federal court lacks subject
> matter jurisdiction, if the relief requested effectively would reverse
> a state court decision or void its ruling."   *Taliaferro v. Darby Twp.*
> *Zoning Bd.*, 458 F.3d 181, 192 (3d Cir. 2006).   The Supreme Court
> has emphasized that the scope of this doctrine is narrow, and that it
> applies only to "'cases brought [1] by state-court losers [2]
> complaining of injuries caused by state-court judgments [3]
> rendered before the district court proceedings commenced and [4]
> inviting district court review and rejection of those judgments.'"
> *Id.* (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544
> U.S. 280, 284 . . . (2005)).

*Purpura v. Bushkin, Gaimes, Gains, Jonas & Stream*, 317 F. App'x 263, 265 (3d Cir. 2009).   The

*Feldman-Rooker* doctrine applies to both claims which were actually litigated in the state courts

and those "inextricably intertwined with an adjudication by a state court.   *Taliaferro*, 458 F.3d at

192.   "[A] federal action is inextricably intertwined with a state adjudication, and thus barred in

federal court under *Feldman*, [w]here federal relief can only be predicated upon a conviction that

the state court was wrong." *Id.* (quoting *Parkview Assoc. P'ship v. City of Lebanon*, 225 F.3d 321, 325 (3d Cir. 2000)).   Thus, where a federal court is "asked to redress injuries caused by an unfavorable state-court judgment," the doctrine prevents the district court from hearing those claims.   *Id.*; *see also Exxon Mobil*, 544 U.S. at 293.

In *Purpura*, the Third Circuit was faced with a situation analogous to that presented by Plaintiff's complaint:   the *Purpura* plaintiff brought RICO claims against his former wife, her attorney, his own attorneys, and state court judicial officers claiming that the defendants "conspired to use the New York divorce action as a vehicle to fraudulently obtain and enter judgments against him."   317 F. App'x at 264.   The *Purpura* plaintiff had "lost at every level of the New York state courts. . . his complaint [sought] redress solely for 'injuries' caused by those state court judgments – i.e., the payments and other property distributions that those judgments have required to make," and the state court proceedings had concluded prior to the bringing of his federal complaint.   *Id.* at 266.   Based on these facts and the Third Circuit's conclusion that "success on [the plaintiff's] claims would entail a ruling that the state judgments he challenges are invalid because they were the product of fraud, the denial of due process, or both," the Court concluded that the *Purpura* plaintiff's claims were "precisely the kind of action that the *Rooker-Feldman* doctrine is designed to preclude" and thus dismissed the plaintiff's appeal as the District Court lacked subject matter jurisdiction to hear his original case.   *Id.*

Although Plaintiff has not expressly requested the invalidation of the state court's judgments, the only RICO injuries Plaintiff has pled are either the direct result of the state court's orders – his continued incarceration for civil contempt and the $600,000 judgment against Plaintiff – or the indirect result of those orders – Plaintiff's loss of property and reputation in Israel as a

18

result of his continued incarceration for six years.[8]   Plaintiff's second and third RICO conspiracy claims therefore ask this Court to redress injuries caused by the state court's judgments, and these claims are therefore inextricably intertwined with the state court's underlying orders and judgments and are in turn subject to the *Rooker-Feldman* doctrine.   Plaintiff, as in *Purpura*, is asking this Court to award him damages based on a finding that the state court's judgments were the result of fraud or a denial of his due process rights, and, as a result, his second and third RICO claims are barred and this Court lacks subject matter jurisdiction to hear them.   317 F. App'x at 263-64.


**C.   Plaintiff's 42 U.S.C. § 1983 Claims[9]**

Other than his RICO allegations, Plaintiff's only federal claims are those through which Plaintiff seeks to sue Defendants for violations of his Fourteenth Amendment rights.   42 U.S.C.

---

[8] To the extent that Plaintiff's damages arise directly or indirectly out of his incarceration, those damages are the result of personal injury to plaintiff rather than injury to his business or property and would not be not actionable under RICO in any event.   *See Magnum*, 253 F. App'x at 227; *Evans*, 434 F.3d at 926-27; *see also Hemi Group, LLC*, 559 U.S. at 9.   Thus, the only real out of pocket injury Plaintiff has pled for the second and third RICO conspiracies would be the state court's judgment of $600,000.

[9] Plaintiff also attempts to raise claims pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 397 (1971).   A *Bivens* claim is the federal analogue to an action under § 1983 and thus applies to those defendants Plaintiff alleges acted under color of federal, rather than state, law.   *See Brown v. Philip Morris, Inc.*, 250 F.3d 789, 800 (3d Cr. 2001) ("A *Bivens* action . . . is the federal equivalent of the § 1983 cause of action against state actors, [it] will lie where the defendant has violated the plaintiff's rights under color of federal law").   As the confines of a *Bivens* claim and a similar claim brought pursuant to § 1983 are usually coterminous, the same legal principles apply to both claims and the legal analysis is virtually identical.   *Id.*   This Court therefore refers to all of Plaintiff's civil rights claims as § 1983 claims, although *Bivens* technically applies to the federal Defendants.

§ 1983 provides "private citizens with a means to redress violations of federal law committed by state individuals." *Woodyard v. Cnty. Of Essex*, 514 F. App'x 177, 180 (3d Cir. 2013).   To assert a claim under the statute, a plaintiff must show that he was a deprived of a federal constitutional or statutory right by a state actor. *Id.*   When evaluating the merits of a § 1983 claim, the Court must identify the contours of the underlying right Plaintiff claims was violated and determine whether Plaintiff has successfully alleged a violation of that right. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000).

Claims brought pursuant to 42 U.S.C. § 1983 in New Jersey are subject to New Jersey's two year personal injury statute of limitations. *See Patyrak v. Apgar*, 511 F. App'x 193, 195 (3d Cir. 2013).   "Under federal law, a cause of action accrues, and the statute of limitations begins to run when the plaintiff knew or should have known of the injury upon which its action is based. *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009).   "As a general matter, a cause of action accrues at the time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury." *Id.*   Plaintiff raises the following claims pursuant to § 1983: false arrest and false imprisonment, malicious prosecution, selective prosecution, abuse of process, denial of right to a fair trial through the fabrication of evidence and inducement of false testimony/perjury, and stigma plus defamation.

### 1.  Plaintiff's Conspiracy Allegations

Underlying all of Plaintiff's claims for relief is the contention that the numerous defendants conspired against him.   Indeed, Plaintiff even attempts to plead conspiracy to violate his rights as a separate count under § 1983.   As Plaintiff has not pled that the conspiracy was motivated by

racial bias or the like, however, that is not a stand-alone claim, but rather a means of tying all of the Defendants to his various civil rights claims. *See, e.g., Epshteyn v. Ct. of Common Please Del. County. Pa.*, --- F. App'x ---, ---, 2015 WL 3895403, at *1 (June 25, 2015). Because the chief actors in Plaintiff's many § 1983 claims are private citizens and not state actors, Plaintiff's ability to present these claims pursuant to § 1983 depends entirely upon his ability to tie them to those acting under color of state law through his conspiracy allegations.

To plead a conspiracy claim under § 1983, as with a conspiracy claim under 42 U.S.C. § 1985, a plaintiff must establish that there was a "meeting of the minds" between the members of the conspiracy. *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008). Thus, a complaint alleging conspiracy must "provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action. A conspiracy [involving a judge] cannot be found from allegations of judicial error, ex parte communications . . . or adverse rulings absent specific facts demonstrating an agreement to commit the alleged improper actions." *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 185 (3d Cir. 2009) (quoting *Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990)). As a plaintiff must provide sufficient factual support to raise his conspiracy claims above a speculative level to plausibility, *see Twombly*, 550 U.S. at 555, "the bare allegation of an agreement is insufficient to sustain a conspiracy claim." *Brown v. Deparlos*, 492 F. App'x 211, 215 (3d Cir. 2012). Likewise, it "is insufficient to allege that 'the end result of the parties' independent conduct caused plaintiff harm or even that alleged perpetrators of the harm acted in conscious parallelism.'" *Desposito v. New Jersey*, No. 14-1641, 2015 WL 2131073, at *14 (D.N.J. May 5, 2015) (quoting *Novellino v. N.J. Dep't of Corr. Mountanview Youth*, No. 10-4542, 2011 WL 3418201, at *15 (D.N.J. Aug. 3, 2011).

21

Where a Plaintiff manages to plead state action through at least one member of a given conspiracy, private actors may be held liable under § 1983 for their actions within that conspiracy which violated the plaintiff's rights, even where the only state actors are immune from suit.   *Desposito*, 2015 WL 2131073 at \*15; *see also Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980); *Kach*, 589 F.3d at 646.

Plaintiff's conspiracy allegations suffer from numerous flaws.   Even if one puts aside the many Defendants – such as the fictitious spouse defendants, or the jail official defendants, who are mentioned briefly in passing but about whom few, if any, allegations are made, Plaintiff fails to plead agreement and concerted action as to most of the named Defendants.   Construing Plaintiff's complaint liberally as he is acting pro se, Plaintiff has, at best, pled that the Lipsons, Horts, Lipson's attorney Pitman, Plaintiff's attorneys Friedman and Rubinstein, and, via alleged bribes, Judges Troiano and Casale came to an agreement to allegedly violate Plaintiff's rights, and thereafter acted in accord with that agreement ultimately resulting in Lipson's $600,000 judgment and Plaintiff's continued incarceration for civil contempt.   As to the nearly one hundred named Defendants, Plaintiff makes various vague or conclusory allegations that, because they took actions he did not like, ignored his letters, or because they made decisions contrary to Plaintiff's interest were "enlisted" by alleged members of the conspiracy, joined the alleged conspiracy on a whim and without reason, or came to a "meeting of the minds" with one member of the conspiracy or the other.

These allegations are wholly insufficient to present a plausible claim for conspiracy, and Plaintiff's pleading that further facts are entirely within Defendants' possession does not solve that problem.   Plaintiff's pleading of conspiracy as to those Defendants other than the few specifically

named above provides little other than unsupported conclusions, actions which at best present parallel rather than concerted action, or indifference to Plaintiff's accusations and allegations. As such, Plaintiff's conspiracy claims against them are insufficient. *Twombly*, 550 U.S. at 555; *see also Desposito*, 2015 WL 2131073, at *14. As many of these alleged Defendants are allegedly only part of the conspiracy because of supposedly fraudulent acts, and Plaintiff has utterly failed to meet the heightened pleading requirements of Rule 9 in so much as he has failed to plead with particularity the "who, what, when, and where details of the alleged fraud," Plaintiff's contentions as to these allegedly fraudulent defendants suffer a further deficiency. *See District 1199P Health and Welfare Plan*, 784 F. Supp. 2d at 527. Thus, Plaintiff's § 1983 claims must be dismissed without prejudice as to all Defendants except the Lipsons, the Horts, Pitman, Friedman, Rubinstein, Troiano, and Casale.[10]

Although Plaintiff has pled a conspiracy against these nine Defendants and this Court will therefore address Plaintiff's § 1983 claims as to them below, two of them must be dismissed because they are immune from suit. Specifically, Judges Troiano and Casale are sued for actions

---

[10] As to Governor Christie Plaintiff adequately pleads that the Horts bribed Christie to become a part of the conspiracy. Plaintiff, however, fails to plead any factual support for the contention that Christie engaged in concerted action. Plaintiff pleads only that Christie was in a position to shut Plaintiff out of the court system through his influence and supervisory role over various officials. Plaintiff's suggestion that Christie actually had supervisory authority over the courts, as opposed to the authority to appoint judges thereto, does not appear to comport with the roles of the Governor and Courts in New Jersey. In any event, even if Christie did have the authority Plaintiff alleges he does, Plaintiff has provided no more than conclusory allegations as to any actions, other than ignoring Plaintiff's bribery accusations as to the judges involved, that could be considered concerted action. Plaintiff has therefore failed to plead that Christie engaged in a conspiracy with the other Defendants. *See, e.g., Desposito*, 2015 WL 2131073, at *14. That Plaintiff has otherwise failed to plead how Christie violated Plaintiff's constitutional rights separate and apart from the alleged conspiracy therefore requires that Christie, too, be dismissed without prejudice as to Plaintiff's § 1983 claims.

they took in their official capacity, and are therefore immune from suit.   *See, e.g., Figueroa v. Blackburn*, 208 F.3d 435, 440-41 (3d Cir. 2000) ("judges . . . are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly").   Judges, even in cases alleging bribery or corruption, are thus absolutely immune from civil damages for judicial acts unless those acts were done in the "complete absence of all jurisdiction."   *Id.*; *see also Karras v. Robbins*, No. 08-5264, 2009 WL 2912778, at *4-6 (D.N.J. Sept. 9, 2009).   Here, Plaintiff complains about actions taken by Judges Troiano and Casale in their official judicial capacity in deciding Plaintiff's case and continuing his incarceration pursuant to a civil contempt order.   Thus, they would be absolutely immune so long as they did not act in the complete absence of jurisdiction.   Although Plaintiff attempts to suggest that these judges acted without jurisdiction and thus would not be immune, he specifically states that Judge Troiano considered the service issue and concluded that Plaintiff was subject to "holdover" service in the divorce action, and that Plaintiff was thus properly before the Superior Court.   As such, Plaintiff has failed to plead that the Superior Court acted in the complete absence of all jurisdiction, and both judges are absolutely immune, and must therefore be dismissed without prejudice.   Because conspiring with an immune official can still result in § 1983 liability, however, this does not dispose of Plaintiff's remaining claims.   *Desposito*, 2015 WL 2131073 at *15; *see also Dennis*, 449 U.S. at 27-28; *Kach*, 589 F.3d at 646.

24

### 2.   The United States, the State of New Jersey, and Essex County must be dismissed

Plaintiff, in addition to the conspiracy claims, attempts to plead claims against the United States and the State of New Jersey, as well as a municipal liability claim against Essex County. The State of New Jersey, however, is immune from suit for damages in this Court, and is not a "person" subject to suit under § 1983.   *See, e.g., Garcia v. Richard Stockton Coll. Of New Jersey*, 210 F. Supp. 2d 545, 549-51 (D.N.J. 2002); *see also Grohs v. Yatauro*, 984 F. Supp. 2d 273, 280 (D.N.J. 2013) (the Eleventh Amendment is "a jurisdictional bar which deprives federal courts of subject matter jurisdiction over actions against a State").   The United States is likewise immune from suit as it has not unequivocally consented to suit.   *See, e.g., United States v. Mitchell*, 445 U.S. 535, 538 (1980); *see also F.D.I.C. v. Meyer*, 510 U.S. 471, 484-85 (1994) (*Bivens* does not permit action against the United States or its agencies).   The United States and New Jersey must therefore be dismissed from this action with prejudice.

As to Plaintiff's claim against Essex County,[11] Plaintiff has failed to properly plead a *Monell* claim for municipal liability.   Municipalities and other Municipal defendants are not subject to suit under § 1983 under a vicarious theory of liability.   *See Iqbal*, 556 U.S. at 675-76; *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978).   In order to sue a

---

[11] To the extent that Plaintiff also attempted to plead a claim against the Essex County Correctional Facility, that jail facility is not a person subject to suit under § 1983.   *Kitchen v. Essex Cnty. Corr. Facility*, No. 12-2199, 2012 WL 1994505, at *3 (D.N.J. May 31, 2012); *Ingram v. Atl. Cnty. Justice Facility*, No. 10-1375, 2011 WL 65915, at *3 (D.N.J. Jan. 7, 2011); *see also Marsden v. Federal B.O.P.*, 856 F. Supp. 832, 836 (S.D.N.Y. 1994); *Powell v. Cook County Jail*, 814 F. Supp. 757, 758 (N.D. Ill. 1993); *McCoy v. Chesapeake Corr. Cntr.*, 788 F. Supp. 890, 893-894 (E.D. Va. 1992).   The correct entity subject to suit under § 1983 is the county.   See *Kitchen*, 2012 WL 1994505; *Vance v. Cnty. Of Santa Clara*, 928 F. Supp. 993, 996 (N.D. Cal. 1996) (the county "Department of Corrections is an agency of the County . . . [t]he County is a proper defendant in a § 1983 claim, an agency of the County is not").

25

municipal entity under the statute, a plaintiff must therefore establish that the municipality itself has committed a violation of federal law. *See Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35-36 (2010).   To establish municipal liability under § 1983, a plaintiff must therefore show that the municipality implemented a policy, ordinance, regulation, or custom which caused the deprivation of the plaintiff's rights. *Id.*, *see also Monell*, 436 U.S. at 690-91.   Plaintiff's attempt at pleading municipal liability is entirely based on a theory that the county failed to train certain unspecified Defendants.   As the only Defendants which have not been dismissed are not subject to the County's authority or training, including the state judges who are state officials rather than employees of the county, the county's failure to train its employees cannot serve as a basis for its liability.   As Plaintiff has not otherwise properly pled a *Monell* claim as he has failed to plead any policy or custom instituted by the county which deprived him of his rights, Plaintiff's claims against Essex County must be dismissed without prejudice.

### 3.   Plaintiff's false arrest and imprisonment claims are time barred

Plaintiff first claims that he was falsely arrested and imprisoned through the alleged conspiracy.   Claims for false arrest and false imprisonment accrue respectfully at the time of the arrest, *see Brown v. Schreck*, 2015 WL 4318724, at *3 (D.N.J. July 14, 2015), and at the point where an individual becomes held pursuant to legal process including either the point where he is bound over for trial or arraigned. *See Wallace v. Kato*, 549 U.S. 384, 389-90 (2007).   Here, Plaintiff was arrested and arraigned in April 2009.   His claims for false arrest and false imprisonment both accrued approximately six years before he filed suit in this matter.   As Plaintiff's complaint was filed more than two years after the accrual of these two causes of action,

Plaintiff's claims for each must be dismissed as time barred.   *Patyrak*, 511 F. App'x at 195.

### 4.   Plaintiff has failed to plead claims for malicious prosecution, selective prosecution, and abuse of process under § 1983

Plaintiff also brings claims under § 1983 for malicious prosecution and selective prosecution.   Both of these claims, however, require a plaintiff to plead that he was actually prosecuted for a criminal offense.   *See, e.g., Morris v. Verniero*, 453 F. App'x 243, 246 (3d Cir. 2011) (selective prosecution requires showing that state prosecutors decided to prosecute plaintiff on a discriminatory basis); *McKenna v. City of Phila.*, 582 F.3d 447, 461 (3d Cir. 2009) (claim under § 1983 for malicious prosecution requires that defendants initiated a criminal prosecution without probable cause).   Plaintiff was and is incarcerated pursuant to a civil contempt order and has not been criminally prosecuted.   As such, Plaintiff has failed to plead a claim for which relief may be granted as to both of these claims.[12]

Plaintiff also brings a claim for abuse of process.   As opposed to a malicious prosecution claim which asserts that an action was improperly brought from the start, a § 1983 claim for abuse of process lies where an action is "initiated legitimately and thereafter is used for a purpose other than that intended by law."   *Milburn v. City of York*, --- F. App'x ---, ---, 2015 WL 2240252, at *3 (3d Cir. May 14, 2015) (quoting *Rose v. Bartle*, 871 F.2d 331, 350 n. 17 (3d Cir. 1989).   Where the primary motivation for an action is proper, but that action is in some way also fueled by an "incidental motive or spite or an ulterior purpose," there is no abuse of process.   *See Gen.*

---

[12]   Even if Plaintiff were not required to plead a criminal prosecution to establish malicious prosecution, that he has not received a favorable termination of either the order incarcerating him or in the underlying family part matter would further bar that claim.   *McKenna*, 582 at 461.

*Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 305 n. 2 (3d Cir. 2003).   Here, Plaintiff presents his claim in regards to the 2009 proceedings in which Lipson sought to recover moneys allegedly owed her arising out of her divorce of Plaintiff.   This proceeding, as alleged, was put to two purposes: obtaining a judgment against Plaintiff for money damages owed as a result of the divorce and Plaintiff's continued incarceration under a civil contempt order until such time as he either pays that judgment or facilitates its payment.   These purposes, even if partially sought out of animus or personal antagonism for Plaintiff, are the lawful and appropriate purposes intended for an action for damages arising out of a divorce and for a civil contempt order.   As such, Plaintiff has failed to plead a proper claim for abuse of process, and that claim must be dismissed without prejudice.

### 5.   Plaintiff has failed to plead a claim for "stigma plus" defamation

Plaintiff further claims that he was subject to "stigma plus" defamation in violation of his due process rights.   To establish a cause of action for stigma-plus defamation under § 1983, a plaintiff must show that someone acting under color of state law caused stigma by defaming him through the making of a public statement that was false, and that this defamation occurred in the process of the alteration or extinguishment of a liberty or property interest.   *See Hill v. Borough of Kutztown*, 455 F.3d 225, 235-37 (3d Cir. 2006).   Although Plaintiff attempts to plead a conspiracy to violate his rights generally, the only purportedly defamatory statement underlying his stigma-plus claim are statements made by his ex-wife in her court filings that Plaintiff "fled the country" to avoid paying money he owed his ex-wife and children.   (ECF No. 1 at 141, 186-87).   Thus, as to this claim, the only Defendant Plaintiff has pled had any involvement was Lipson,

and the only defamatory statement of which he complains was made solely by her and was not made in the process of extinguishing a recognized liberty or property interest of Plaintiff. Plaintiff has thus failed to plead a proper claim for stigma-plus defamation as he has not pled that anyone other than Lipson, and certainly no one acting under color of state or federal law, made the allegedly defamatory statement, and has failed to show that this defamatory statement was made in the process of terminating his rights. *Id.* As such, this claim must be dismissed.

### 6. Plaintiff's claims that false testimony and fabricated evidence were used against him

Plaintiff's final § 1983 claims arise out of his contentions that the lawyer defendants used fabricated evidence against him in the state courts, and claims that Lipson gave false testimony against him, allegedly in violation of Plaintiff's Fourteenth Amendment Due Process rights. To the extent that Petitioner wishes to hold Defendants liable for perjury or false testimony given during judicial proceedings, those claims are barred as witnesses at such judicial proceedings are absolutely immune for testimony given during a trial or similar judicial proceedings. *See Rehburg v. Paulk*, --- U.S. ---, ---, 132 S. Ct. 1497, 1505 (2012) (noting that criminal perjury charges, rather than civil liability, provide sufficient deterrent to false testimony, and that testifying witnesses are absolutely immune). To the extent that Petitioner instead wishes to raise a stand-alone claim under § 1983 for the presentation of fabricated evidence to the Superior Court by the lawyer Defendants, this Court notes that the Third Circuit has recognized such a claim in the criminal context. *See Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014). Halsey discussed such a claim specifically in regards to the concerns and constitutional rights which come to bear in a criminal prosecution. *Id.* at 293-95. Indeed, the *Halsey* court specifically stated that its holding, that a

stand-alone claim could be brought under § 1983 for the use of fabricated evidence in a criminal trial, should not be extended beyond the scope of that specific holding. *Id.* at 295. This Court is aware of no authority extending that holding or providing a similar claim under § 1983 for the use of allegedly false evidence in a civil matter, and Plaintiff has not provided any such basis for his claim. As such, Plaintiff has failed to state a claim for relief under § 1983 in relation to his fabricated evidence claim.

To the extent that Plaintiff wished to raise a state law claim arising out of the use of allegedly fabricated evidence, this Court need not address that claim. As this Court shall dismiss all of Plaintiff's federal law claims over which this Court has original jurisdiction, this Court need not, and will not exercise supplemental jurisdiction over Plaintiff's remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000). As this Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims as it will dismiss all claims over which it had original jurisdiction, this Court also need not and will not address Plaintiff's intentional infliction of emotional distress claim and other pendant state law claims. As this Court has dismissed all claims over which it had original jurisdiction and has declined to exercise supplemental jurisdiction over Plaintiff's state law claims, plaintiff's complaint will be dismissed in its entirety.

## III. CONCLUSION

For the reasons stated above, this Court will dismiss Plaintiff's complaint in its entirety for want of subject matter jurisdiction and failure to state a claim for which relief may be granted. An appropriate order follows.

_____
Hon. Jose L. Linares,
United States District Judge

31